UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Creative Group Acquisition Co., et al.<br><br>Debtor. | Chapter 11<br><br>Case No. 13-12258 (KJC)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING THE USE OF CASH COLLATERAL,
(B) GRANTING ADEQUATE PROTECTION TO LIEN HOLDERS
AND (C) SCHEDULING A FINAL HEARING**

Creative Group Acquisition Co. ("Creative") and Creative Payment Processing, Inc ("Processing", collectively the "Debtors") file this Motion ("Motion") seeking entry of an interim order, (the "Interim Cash Collateral Order") and a final order (the "Final Cash Collateral Order"), substantially in the form attached hereto as **Exhibit A,** together with the Interim Cash Collateral Order (a) authorizing the use of cash collateral, (b) granting adequate protection to lien holders, (c) prescribing the form and manner of notice and setting the time for the final hearing on the Motion, and (d) granting related relief and further relief as this Court deems just and proper. In support of the Motion, the Debtors rely upon the Declaration of Ronald Kaplan in Support of First Day Motions (the "Kaplan Declaration"), and respectfully state as follows:

## INTRODUCTION

1.  Creative has faced dire liquidity challenges for the past two years. Among the events that necessitated the company's filing for Chapter 11 protection has been the efforts of the United States Department of the Treasury, Internal Revenue Service (the "IRS") and New York State taxing authorities to levy upon the banks and customers of Creative, actions that unless curtailed will result in the inability of Creative to make payroll for its over seventy employees,

1

service its contracts, or continue its operations. In seeking the right to utilize cash collateral, the Debtors seek relief that will allow their income stream to continue and therefore preserve the only conceivable method by which the Federal, state taxing authorities, and secured lenders could possibly be paid. Absent access to the cash produced by its operations and the preservation of its value as going-concerns, the Debtors are largely valueless, having little in the way of assets other than their customer base, goodwill, and on-going revenue-producing projects.

2. Efforts by the Debtors and their counsel to contact the IRS have received no response, consequently there has been no possibility of a consensual resolution upon the issue of cash collateral.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157 (b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested herein are Bankruptcy Code sections 361 and 363 of title 11 of the United States Code (§§ 101-1330) (the "Bankruptcy Code") and Rules 4001 and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## SUMMARY OF RELIEF

5. The Debtors request entry of interim and final orders authorizing the Debtors to:

(a) Use of cash collateral consisting of the Debtors' cash on hand and the revenue produced by Creative from its ordinary course operations (the "Cash Collateral") in accordance with the budget and revenue projections (the "Budget") attached to this Motion as **Exhibit B**;

(b) Grant liens and allowed superpriority administrative expense claims to the IRS as adequate protection of the interests of the IRS in the Cash Collateral;

(c) Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the

terms and provisions of the Interim Order;

(d) Schedule a final hearing on the Motion to consider entry of the Final Cash Collateral Order; and

(e) Granting related relief and such other and further relief as the Court deems just and proper.

## BACKGROUND

6. Creative is a diversified entertainment and media company that produces live action, animation, sound design, sound mixing and recording and broadcast design for the television and film industries. Creative's services span all media types with operations comprising the entire spectrum of concept development through creative implementation, production, post-production, and distribution. Processing conducts no independent business but was formed in May 2013 solely to centralize payment services for Creative.

7. Creative is well known in its industry for its work on behalf of cable and broadcast networks owned by international media companies such as Viacom (CBS, MTV, VH-1, Nickelodeon, Spike), and NBC/Universal (NBC Sports).

8. The traditional business of Creative, its bread-and-butter operations, has been in the area of post-production videotape editing and sound-mixing for cable and broadcast customers. In recent years, Creative has embarked on a program of original content property development as well, which, following industry trends, appears to be the area of most promising growth for Creative and similarly situated companies.

9. The value of Creative's business lies entirely in the creativity of its more than seventy (70) employees, their interactive synergy, and their relationships with their customers, rather than in an inventory of physical assets. Accordingly, in order to maximize the value of the Debtors' estates, it is essential that both employees and customers continue their relationships

3

with Creative's business.

10. Prior to the commencement of its chapter 11 case, Creative's business suffered from a severe liquidity crisis. The crisis had multiple causes largely related to the national economic downturn and changes and contractions in Creative's industry. As advertising revenue contracted, cable networks tightened their belts and began utilizing in-house facilities to complete their post-production work. The emerging popularity of "reality shows" on cable channels accelerated this transition. The "reality shows" were much cheaper to produce than scripted television, could be edited on inexpensive toolsets, and could be supported by a freelance editorial labor pool. The demand for external post-production facilities declined, as cable producers hired freelance personnel to work in-house on these shows that seemingly overnight were becoming the primary product on cable channels.

11. Additionally, to stay competitive, content producers and distributors began producing their content in "high-definition" ("HD") video format much quicker than anyone had foreseen. Unfortunately for Creative, the bulk of the equipment it had purchased from its inception in 2008 had been "standard definition" ("SD"), which suddenly was becoming no longer the standard. While the value of this equipment rapidly decreased, the long-term indebtedness Creative had incurred to purchase it remained constant. More importantly, the stream of revenue reasonably projected to be earned over time from the utilization of that equipment, and to service that indebtedness, shrank dramatically.

12. Creative, which has a significant sports programming client base that requires external production and post-production work, was able to weather the changes in the industry better than many of its competitors. However, to hold on to work and accommodate clients who might otherwise seek to develop in-house resources, Creative was forced to cut its margins and was not always successful in retaining or replacing clients who were anxious to trim their costs to

4

survive in a lagging economy.

13. Realizing that at best it was maintaining itself in an untenable situation, Creative made significant efforts to expand its business into the growing field of web-based advertizing and social media. Many of these efforts were and continue to be successful. As a result, Creative reasonably foresees being considerably less dependent on traditional post-production in the near future.

14. However, one effort to grow this business by the acquisition of an existing "new media" business proved a bad investment. On or about March 22, 2012, the Debtor bought a fifty-six percent (56%) interest in Indelible Media Corp. ("Indelible"). Creative paid $500,000, plus the assumption of certain liabilities. Unfortunately, Creative soon discovered that revenue that Indelible had booked prior to the acquisition was in fact unearned revenue for which unforeseen costs would have to be expended to earn the money that, in some cases, had already been spent prior to the acquisition. Further, it soon became clear that Indelible had vastly overstated its roster of established clients and lacked the expertise to perform the quality of web-based design work Creative required to attract significant clients.

15. Finally—in January 2013, after less than a year—Indelible was shut down. Creative was left subsidizing the business in its final months, and was left with the costs of resolving outstanding liability under Indelible's office lease and the considerable costs of transferring Indelible's salvageable equipment and some personnel to the Creative's facilities at 1601 Broadway, New York, New York. In addition, Creative was also obligated to pay off other Indelible debts, including bank debt for which Creative had provided guarantees.

16. Creative also owns an 82.5% interest in Henry & Me Productions, LLC ("H&M"). H&M is a production vehicle that currently has a feature length animated film produced in cooperation with the New York Yankees and Major League Baseball. Several

significant events, including substantial unforeseen legal and financial developments, have prevented H&M from completing that movie.

### Creative's Pre-Petition Secured Financing and Tax Liens

#### *Loan obligations*:

17. **Community National Bank.** As of its Petition Date, Creative was indebted to Community National Bank ("CNB") in the aggregate principal amount of approximately $5,174,041, pursuant to (i) a term note in the original principal amount of $5,000,000 dated as of December 27 2011 ("Term Note"); (ii) a revolving credit note in the original principal amount of $2,400,000 dated as of December 27, 2011 (the "Revolving Note"); (iii) pursuant to a guaranty agreement dated as of May 10, 2012, Creative also guaranteed the indebtedness of Mantra Graphics, LLC, n/k/a Indelible Agency ("Mantra"), related to a term note in the original principal amount of $500,000 dated as of May 10, 2012 and a revolving credit note in the original principal amount of $500,000 executed by Mantra.

18. Pursuant to a Revolving Credit, Term Loan, and Security Agreement dated as of December 27, 2011 (the "CNB Security Agreement") Creative's obligations to CNB under the Term Note and Revolving Note are secured by a primary lien upon substantially all of its assets.

19. **Signature Bank.** Additionally, as of the Petition Date, Creative was indebted to Signature Bank, N.A. ("Signature") in the aggregate principal amount of approximately $1,906,750 pursuant to a subordinated secured note dated as of June 30, 2008 as amended pursuant to the Amendment dated as of March 29, 2012 (collectively, the "Subordinated Note").

20. The Subordinated Note is secured by substantially all of Creative's assets

pursuant to the Security Agreement dated as of June 30, 2008, by and between Creative and Signature. Signature's security interests in and liens upon the Creative's assets are subordinated to CNB's liens and security interests pursuant to a Subordination and Intercreditor Agreement dated as of December 27, 2011.

### *Tax Liens*

### *Federal tax liens*

21. According to IRS notices and demands, Creative owes outstanding taxes to the United States is the approximate amount of $ 2,998,378.22 as of its Petition Date Of this total amount, notice was received and penalties assessed in the amount of $710,489.66 by notice from the IRS dated July 1, 2013 (the "IRS Tax Notice"), and Notices of Intent to Levy dated May 13, 2013 (in the amount of $462,647.04), May 13, 2013 (in the amount of $505,829.92); dated June 3, 2013 (in the amount of $482,021.23) and August 12, 2013 (in the amount of $1,598.19) (collectively, the "IRS Levy Notices"). In addition, by notice dated July 22, 2013, the IRS asserted a tax liability against Creative for taxes due against Mantra in the amount of $486,046.40 and accessed a penalty in the amount of $349,745.99, for a total indebtedness of $835,792.39 Copies of the IRS Tax Notice and IRS Levy Notices are attached hereto as **Exhibit C**.

### *New York State tax liens*

22. According to New York State notices and demands, Creative owes outstanding taxes to New York State in the approximate amount of $301,837 as of the Petition Date. Of this total amount, notice and demand of payment due was received reflecting total tax liabilities of $230,498.54 by notice from the New York State Department of Taxation and

Finance dated July 31, 2013 and Tax Compliance Levy dated August 16, 2013 (the "New York Notices of Demand and Levy"). In addition, on or about June 27, 2013, the New York State Department of Labor as judgment debtor served a notice of garnishment to J.P. Morgan Bank in the amount of $71,337.04, and on or about August 5, 2013, served an additional notice of garnishment in the amount of $66,209.91 upon a customer of the Debtor (the "NYDOL Garnishment Notices"). Finally, notice of a warrant lien, in the amount of $113,433.43 was docketed in New York County by the New York State Department of Taxation and Finance and received by Creative on or about June 18, 2013 (the "Notice of Warranty Lien"). Copies of the New York Notice of Demand, the NYDOL Garnishment Notices, and the Notice of Warrant Lien (collectively, the "New York Tax Notices") are annexed hereto as **Exhibit D**. A commissioned lien search performed by CT Corporation also reflects tax liens filed by New York State on April 30, 2013 and August 13, 2013 (together with the Notice of Warranty Lien, the "NY Recorded Liens"). Copies of the NY Recorded Liens are annexed hereto as **Exhibit E**.

23.  For reasons explained below, CNB, Signature, and New York State are hereinafter collectively defined as the "Junior Lienholders."

## BASIS FOR RELIEF

24.  A debtor's use of property of its estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part:

> If the business of the debtor is authorized to be operated under section…1108…of this title and unless the courts orders otherwise, the [debtor]may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363 (c)(1).

25. Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

26. Here, since neither the IRS nor the Junior Lienholders have consented to the use of cash collateral, use of cash collateral may only be permitted with court authorization pursuant to Section 363(c)(2)(B). That authorization must turn upon satisfaction of section 363(e) of the Bankruptcy Code, which provides that "on request of an entity that has an interest in property...to be used, sold or leased, by the trustee, the court...shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."

27. "The Bankruptcy Code does not expressly define 'adequate protection', but section 361 states that it may be provided (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property. The last possibility is regarded as a catch all, allowing courts discretion in fashioning this protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis." *In re Swedeland Dev. Group*, 16 F.3d 552, 564 (3rd Cir. 1994). Both the language of section 361 and the Third Circuit's summation of that language posit the options in the alternative "or" meaning "[a] debtor need not prove all three elements provided for by Section 361. Rather a plain reading of the statute provides that adequate protection is satisfied upon a showing of cash payments, additional or replacement liens, or any other relief resulting in the indubitable equivalent of the secured creditor's interest." *In re Cardell, Inc.*, 2009 U.S. Dist. Lexis 57580 (D. N.J. July 7, 2009) at * 10.

28.     The determination of adequate protection is a "fact-specific inquiry". *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996)("Its application is left to the vagaries of each case...")(citation omitted). The focus of the adequate protection requirement is to preserve the lienholder's position at the time of the bankruptcy filing and protect the lienholder from diminution in the value of its collateral during the reorganization process. *Id.* at 288; *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004). Accordingly, the creditor is only entitled to protection for the value of its collateral supporting its secured claim that is sought to be used as cash collateral by the debtor. *See, Id.; In re Gallegos Research Group*, 193 B.R. 577, 584-85 (Bankr. D. Colo. 1985)*(citing United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)); *see also, In re Swedeland Dev. Group*, 16 F.3d at 564 ("the [adequate protection] proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.")

29.     At the present, the total value of the IRS indebtedness is undetermined. By official notices received, that value is $ 2,998,378.22 and therefore a lien exists in that amount at present. By law, the IRS tax liens arose automatically "after demand" pursuant to 26 U.S.C. §6321. While IRS liens do not enjoy absolute priority over earlier perfected liens in all cases, such liens enjoy primacy as to after-acquired property—including accounts receivable—acquired after the lien commences. *See, Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1050-1051 (5th Cir. 1972): *United States v. North Side Deposit Bank*, 569 F. Supp. 948, 957-958 (W.D. Pa. 1983). By definition, "accounts receivable are not 'acquired' until services are rendered and the debt becomes owing." *North Side Deposit Bank*, 569 F. Supp. at 958.

30.     The priority among the Junior Lien Holders is easily determined. CNB's lien

sits behind the IRS lien, pursuant to the above-cited federal law.[1] Pursuant to the December 27, 2011 CNB Security Agreement, Creative's obligations to CNB under the Term Note and Revolving Note are secured by a primary lien upon substantially all of its assets. The lien of Signature Bank is also secured by substantially all of Creative's assets pursuant to the Security Agreement dated as of June 30, 2008, however, by its terms, the Signature Bank lien is expressly subordinate to CNB's liens and security interests pursuant to a Subordination and Intercreditor Agreement dated as of December 27, 2011. Finally, the NY Recorded Liens, which arose last in time in 2013, sit most junior in priority, since, pursuant to New York law, such tax liens are accorded a priority equivalent to UCC liens and assert no power to "jump the line" to take priority interests in after-acquired property—such as possessed by the federal government— ahead of earlier perfected non-governmental liens. *See*, NY UCC Law § 9-204; *see also, Chase Manhattan Bank, N.A. v. State of New York*, 48 A.D. 2d 11, 13-14 (3rd Dept. 1975).

31. While the Junior Lienholders may each assert their own secured interests in the cash on hand and in Creative's accounts and after-acquired cash flow, only the IRS is "in the money". In other words, as of Creative's Petition Date, only the IRS had the ability to satisfy its indebtedness from the cash collateral at issue here, and because the IRS lien exceeds that cash collateral, none of the Junior Lienholders would have had a right to any of that cash collateral had the Chapter 11 case not been filed.

32. The consequence of that fact is that none of the Junior Lienholders is entitled to actual cash payments, nor replacement liens, nor any tangible adequate protection relief pursuant to Section 361. As the Third Circuit has held, the goal of adequate protection is to

---

[1] The Debtors intend, within the next 48 hours, to file an adversary complaint challenging the nature, extent, and priority of CNB's alleged first-priority liens on all of Creative's assets.

give the pre-petition secured lender the same protection (the "indubitable equivalent") it would have enjoyed absent the bankruptcy filing. *In re Swedeland Dev. Group*, 16 F.3d at 564. Given the IRS' position, the indubitable equivalent of the Junior Lienholders' interest in the cash collateral is nothing and so their adequate protection needs are zero.

33. As to the IRS, the Debtors propose to provide the IRS with adequate protection in the form of continuing and replacement liens in accounts as they are created and in the consequent cash flow, as well as providing the IRS with superpriority administrative claims. Through the use of the IRS' cash collateral, the IRS will also be adequately protected in that the cash collateral will be used entirely for the maintenance of the Debtors' business and the preservation of its greater collateral value as a going-concern. Absent the relief, much of the cash collateral subject to this motion would not even come into existence, since the Debtors' business is operated largely on a per-project basis and cessation of the business will not only cause an end to income generation, but also make Creative liable to the return of progress payments. Kaplan Decl. at ¶ 41. Consequently, and somewhat ironically, absent granting the Debtors' use of cash collateral, the IRS' cash collateral may be "unjustifiably jeopardized". *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991)("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized"). The Debtors respectfully submit that the protections proposed herein are appropriate to adequately protect the IRS's security interests, and that the Debtors have provided adequate factual information to make that determination. Accordingly, the Court should authorize the Debtors' use of cash collateral in accordance with the Budget annexed hereto.

## INTERIM RELIEF

34. Bankruptcy Rule 4001 (b) provides that the Court may fix the time within which a final hearing on a motion for authorization to use cash collateral may commence no earlier than 14 days after service of the motion. However, Rule 4001(b) further provides that the Court may conduct a preliminary hearing prior to the expiration of the 14 day period and "may authorize the use of only that amount of cash collateral as is necessary to avoid the immediate and irreparable harm to the estate pending a final hearing."

35. The urgent need to preserve the Debtors' business and avoid immediate and irreparable harm to their estates makes it imperative that the Debtors be authorized to use cash collateral pursuant to the terms set forth in the Interim Order and summarized in this Motion pending the Final Hearing. It is critical that Creative maintains the confidence of its employees, who are its primary assets as an enterprise that sells creativity, and its clients in its ability to meet its obligations irrespective of the filing of the Chapter 11 proceeding. The denial of the use of cash collateral would result in the immediate shut down of Creative's operations, the loss of seventy jobs, and, ironically, the destruction of the bulk of the cash collateral sought to be used, as well as the loss of any hope that the IRS' tax arrearages could ever be paid, irreparably damaging the Debtors, their estates, and the creditor whose cash collateral is the subject of this Motion.

36. Accordingly, this Court should enter an order authoring the Debtors' use of cash collateral pursuant to the terms set forth in the proposed Interim Order pending a Final Hearing and should schedule the Final Hearing pursuant to Bankruptcy Rule 4001.

37. No previous request for the relief sought herein has been made to this Court or any other court.

## NOTICE WITH RESPECT TO INTERIM HEARING

38. Notice of this Motion will be given to: (1) the United States Trustee for the District of Delaware (the "United States Trustee"); (2) the Office of the Attorney General of the United States; (3) the Debtors' twenty (20) largest unsecured creditors; (3) the United States Department of the Treasury, Internal Revenue Service; (4) counsel for CNB; (5) counsel for Signature Bank; (6) the New York State Department of Taxation and Finance; (7) the New York State Department of Labor and (8) all parties who have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Interim Hearing Notice Parties"). The Debtors submit that, under the circumstances, no other and further notice is required.

## NOTICE WITH RESPECT TO FINAL HEARING

39. No trustee, examiner or statutory committee has yet been appointed in this Chapter 11 case. Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that the Court authorize them to provide notice of the Final Hearing by serving notice of the Interim Order and proposed Final order upon the Interim Hearing Notice Parties by first class mail, or for those set up to receive electronic transmissions, by electronic transmission. In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (a) enter the Interim Order granting the relief requested herein; (b) schedule a Final Hearing; (c) following the Final Hearing, enter the Final Order; and (d) grant the Debtors such other relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
       September 6, 2013

GELLERT SCALI BUSENKELL & BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (No. 3933)
913 N. Market Street, 10th Floor
Wilmington, Delaware 19801
Tel: (302) 426-5800

and

DUFFYAMEDEO LLP
Todd E. Duffy
Douglas A. Amedeo
275 Seventh Avenue, 7th Fl
New York, New York 10010
Tel: (212) 729-5831
*Proposed Counsel to the Debtors and Debtors in Possession*