IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CREATIVE GROUP ACQUISITION CO., | Case No. 13-12258 (KJC) |
| Debtor. | |

**AFFIDAVIT OF CONRAD GUNTHER IN SUPPORT OF EMERGENCY MOTION OF COMMUNITY NATIONAL BANK TO PROHIBIT USE OF CASH COLLATERAL**

STATE OF NEW YORK     )
                      ) ss.
COUNTY OF NASSAU      )

CONRAD GUNTHER, being duly sworn to oath, deposes and says:

1. I am an Executive Vice President of movant, Community National Bank ("CNB"), and am authorized to make this affidavit on behalf of CNB. The statements made in this affidavit are based upon my personal knowledge and my review of the records maintained by CNB in the ordinary course of business. I make this affidavit in support of CNB's *Emergency Motion to Prohibit Use of Cash Collateral*, filed on September 5, 2013 [Docket No. 9] (the "Motion").

2. I have access to the business records of CNB, including the business records for, and relating to, the loans (collectively, the "Loan") to Debtor Creative Group Acquisition Co. (the "Debtor"). I make this affidavit based upon my review of those records relating to the Loan, and from my own personal knowledge of how they are kept and maintained. The records for the Loan, including computerized records, are maintained by CNB in the normal course of its regularly conducted business activities and are made at or near the time of the occurrence of the events which they reflect, by or from information transmitted by a person with knowledge. It is

the regular practice of CNB to keep such records in the ordinary course of a regularly conducted business activity.

3. The Motion seeks an order:

(i) prohibiting the Debtor from any further use of the cash collateral;

(ii) directing the Debtor to account for, and immediately pay to CNB, an amount equal to (a) all cash it had on hand as of the Petition Date, including but not limited to the TD Bank Funds; and (b) all cash and checks that it has received and deposited since the Petition Date;

(iii) requiring the Debtor turnover to CNB all checks that it receives from any account debtor on and after the date of filing of this Motion, properly endorsed to the order of CNB; and

(iv) for such other and further sanctions as may be appropriate for the Debtor's willful violation of Bankruptcy Code and/or such other relief as is just.

4. By way of background, according to the documents provided to CNB by the Debtor, the Debtor is a production and post-production company which provides creative services to cable networks and broadcast facilities, including "high definition linear and non-linear videotape editing, compositing, duplication, 3-D Computer graphic special effects, design and experiential, stereoscopic 3-D, Surround Sound digital audio mixing, sweetening, voice over and DVD Authoring". Upon information and belief, Joseph Avallone ("Avallone") is the president of the Debtor.

5. Avallone approached CNB to obtain loans on behalf of the Debtor in order to, among other things, to pay off existing loans and obtain working capital. The Debtor ultimately obtained two loans from CNB, including a "term" loan and a "revolving line of credit". There is

currently in excess of $5,174,041.40 due and owing to CNB on the Loans. As set forth in detail below, as security for the Loans, the Debtor pledged all of its inventory, equipment, accounts receivable, general intangibles and the proceeds thereof (hereinafter "Collateral" and specifically as to cash proceeds, the "Cash Collateral") as collateral.

6. The Debtor and Avallone have informed CNB that they intend to sell the Debtor's assets to another company, Reveal 42, Inc. ("Reveal"), of which Avallone is the president. According to New York State Department of State's website, Reveal was recently formed on July 11, 2013.

7. In addition, upon information and belief, based upon the limited disclosures made by the Debtor, the limited payments made by the Debtor and its prior account history with CNB, the Debtor currently maintains a bank account with TD Bank, N.A. ("TD Bank"), which CNB estimates to contains approximately $500,000.00 (the "TD Bank Funds"). The Debtor has violated the terms of the Revolving Credit, Term Loan and Security Agreement (the "Agreement").

8. For the convenience of the Court, I have summarized the Loans, various loan documents between CNB and the Debtor and the Debtor's breach of those agreements.

### TERM NOTE AND REVOLVING CREDIT NOTE

9. The Debtor executed a term note in the original principal amount of $5,000,000.00, dated as of December 27, 2011 (the "Term Note"). A true and complete copy of the Term Note is annexed to the Motion as Exhibit "A". Pursuant to the express terms of the Term Note, the Debtor was required to remit one (1) installment of $17,152.78 due on January 15, 2012, and thirty six (36) successive monthly payments of principal and interest in

3

installments of $153,245.01 beginning on February 15, 2012, with a final payment due on January 15, 2015.

10. The Debtor also executed a revolving credit note in the original principal amount of $2,400,000.00 dated as of December 27, 2011 (the "Revolving Credit Note"). A true and complete copy of the Revolving Credit Note is annexed to the Motion as Exhibit "B".

11. In connection with the Term Note and Revolving Credit Note, the Debtor executed a Revolving Credit, Term Loan and Security Agreement (the "Agreement"). A true and complete copy of the Agreement is annexed to the Motion as Exhibit "C".

12. The Agreement set forth certain financial covenants required of the Debtor, including, *inter alia*, those set forth in Sections II, IV to IX thereof. Pursuant to the express terms of the Agreement, with respect to the Revolving Credit Note, the Debtor was required to remit payments of interest on the outstanding advances on the fifteenth day of each month. See Exhibit "C" to Motion.

13. Pursuant to § X of the Agreement, an event of default occurs with respect to the Term Note and Revolving Credit Note upon, among other things:

    (a) the failure to remit any payment when due;

    (b) the default by the Debtor or any guarantor of any other monetary obligation;

    (c) the failure of the Debtor to comply with any covenant set forth in the Loan Documents, as defined below; and

    (d) if the Debtor becomes insolvent.

See Exhibit "C" to Motion at § X.

4

14. Pursuant to the Agreement, the Debtor granted to CNB a lien and security interest in the Collateral, as defined in the Agreement, including without limitation, all inventory, equipment, accounts receivable, general intangibles and the proceeds thereof (hereinafter "Collateral"). See Exhibit "C" to Motion at § IV. In particular, the Agreement defined Collateral as follows:

> "Collateral" means and includes:
>
> (a)  all Receivables;
>
> (b)  all Equipment;
>
> (c)  all General Intangibles;
>
> (d)  all Inventory;
>
> (e)  all Investment Property;
>
> (f)  all Subsidiary Stock;
>
> (g)  the Leasehold Interests;
>
> (h)  all of Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located, (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or

5

real property now owned or hereafter acquired in which Borrower has expressly granted a security interest or may in the future grant a security interest to Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Lender and Borrower;

(i) all of Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g) or (h) of this Paragraph; and

(j) all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h) and (i) in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

Exhibit "C" to Motion at p.3-4.

15. The Agreement also defined CNB's security interest as follows:

4.1 **_Security Interest in the Collateral._** To secure the prompt payment and performance to Lender of the Obligations, Borrower hereby assigns, pledges and grants to Lender a continuing first priority security interest in and to and Lien on all of its Collateral, subject to the Permitted Encumbrances, whether now owned or existing or hereafter acquired or arising and wheresoever located until indefeasible payment in full of the Obligations with respect to the Revolving Credit Loan. After indefeasible payment in full of the Obligations with respect to the Revolving Credit Loan, the aforementioned security interest will be terminated with respect to all of Borrower's Collateral other than the Equipment and the Collateral described in clauses (i) and (j) of the definition of "Collateral" (solely to the extent related to or arising from the Equipment), which shall continue to secure the prompt payment and performance to Lender of the Obligations with respect to the Term Loan. Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Lender's security interest and shall cause its financial statements to reflect such security interest. Borrower shall promptly provide Lender with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s). Upon delivery of each such notice, Borrower shall be deemed to hereby grant to

6

Lender a security interest and lien in and to such commercial tort claims and all proceeds thereof.

Exhibit "C" to Motion at § IV.

16. CNB perfected its security interest in the Collateral by filing UCC-1 financing statements in the office of the Delaware Department of State, which were subsequently amended to expressly include all of the Debtor's right, title and interest to the motion picture entitled: "'Henry & Me', together with all proceeds thereof," copies of which are annexed to the Motion as Exhibit "D".

17. CNB had the following rights and remedies upon a default by the Debtor, including, among other things:

> 11.1 ***Rights and Remedies.***
>
> (a) Upon the occurrence of (i) an Event of Default pursuant to Section 10.7 all Obligations shall be immediately due and payable and this Agreement and the obligation of Lender to make Advances shall be deemed terminated, (ii) any of the other Events of Default and at any time thereafter (such default not having previously been cured), at the option of Lender all Obligations shall be immediately due and payable and Lender shall have the right to terminate this Agreement and to terminate the obligation of Lender to make Advances and (iii) a filing of a petition against Borrower in any involuntary case under any state or federal bankruptcy laws, all Obligations shall be immediately due and payable and the obligation of Lender to make Advances hereunder shall be terminated other than as may be required by an appropriate order of the bankruptcy court having jurisdiction over Borrower. Upon the occurrence of any Event of Default, Lender shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Lender may enter any of Borrower's premises or other premises without legal process and without incurring liability to Borrower therefor, and Lender may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Lender may

SL1 1256327v1 108346.00001 CEV/D910089v1/M059964/C0154260

deem advisable and Lender may require Borrower to make the Collateral available to Lender at a convenient place. With or without having the Collateral at the time or place of sale, Lender may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Lender may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give Borrower reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrower at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Lender may bid for and become the purchaser, and Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by Borrower. In connection with the exercise of the foregoing remedies, including the sale of Inventory, Lender is granted a perpetual nonrevocable, royalty free, nonexclusive license and Lender is granted permission to use all of Borrower's (a) trademarks, trade styles, trade names, patents, patent applications, copyrights, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof. Noncash proceeds will only be applied to the Obligations as they are converted into cash. If any deficiency shall arise, Borrower shall remain liable to Lender therefor.

\*\*\*

11.3    *Setoff.* In addition to any other rights which Lender may have under Applicable Law, upon the occurrence of an Event of Default hereunder, Lender shall have a right, immediately and without notice of any kind, to apply Borrower's property held by Lender to reduce the Obligations.

11.4    *Rights and Remedies not Exclusive.* The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

Exhibit "C" to Motion at § XI.

8

## **THE DEFAULTS**

18. The Debtor defaulted under the Term Note and Agreement by failing to make payments when due on May 15, 2013, and thereafter.

19. The Term Note and Agreement provide that in the Event of Default, the principal amount of the Term Note shall become due and payable, together with all interest thereon, attorneys' fees and costs. The amount due on the Term Note is the outstanding principal balance in the amount of $3,006,454.13, plus interest at the rate set forth in the Term Note from and after May 16, 2013 to the date of entry of judgment, plus late charges, attorneys' fees and costs.

20. The Debtor also defaulted under the Revolving Credit Note and Agreement by failing to pay the outstanding balance on the maturity date of May 31, 2013. The amount due on the Revolving Credit Note is the outstanding principal balance in the amount of $2,167,587.32, plus interest at the rate set forth in the Revolving Credit Note from and after April 30, 2013, to the date of entry of judgment, plus late charges, attorneys' fees and costs.

21. As of the date hereof, the Debtor has failed to repay the outstanding principal or accrued interest due and payable under the Loan Documents.

22. As a result of these defaults, on or about June 17, 2013, CNB commenced an action against the Debtor (among others) in the Supreme Court of the State of New York, County of Nassau. Thereafter, on or about June 28, 2013, CNB and the Debtor entered into an extension agreement (the "Extension Agreement") which provided with respect to the Term Note that "[t]he Bank agree[d] to provide a principal moratorium on the Term Loan for May 15th and the June 15th payment." A true and correct copy of the Extension Agreement is attached to the Motion as Exhibit "F." Pursuant to the Extension Agreement, with respect to the Revolving Credit Note, "[t]he Bank agree[d] to extend the Maturity Date of the Line of Credit to July 15, 2013". Exhibit "F" to Motion.

23. Furthermore, pursuant to the Extension Agreement, CNB specifically reserved its rights with respect to the breach of the Loan Documents by the Debtor. In particular, the Extension Agreement provide in pertinent part that:

> There is presently pending in the Supreme Court of the State of New York, County of Nassau, an action known as Community National Bank v. Creative Group Acquisitions Co. et. al. (the "Action"). CNB reserves all rights in the Action, at law, in equity, and by contract. Nothing contained herein shall constitute a waiver or estoppel of CNB's rights in any way whatsoever.

Exhibit "F" to Motion.

24. The Debtor has breached the Extension Agreement by failing to make the payment which was due on July 15, 2013, and is now in default.

## MISREPRESENTATIONS

25. In order to induce CNB to extend the loans to the Debtor, Avallone represented that the Debtor owned the rights to an animated movie "Henry & Me" and that it was in the process of producing this movie.[1] In order to induce CNB to extend the loans to the Debtor, Avallone represented, among other things, that this movie would be part of the security and collateral for the Loans.

26. Avallone also represented that the Debtor did not have any subsidiaries. See Exhibit "C" to Motion at § 5.2.

27. In order to induce CNB to make the Loans, Avallone provided CNB with various financial statements including a Financial Statement as of June 30, 2011, which provided that the Debtor was presently producing a short animated film that was not yet completed. See Exhibit

---

[1] Henry & Me is a movie based upon certain books authored by Ray Negron, a special advisor to George M. Steinbrenner III about a "young boy battling illness is taken on a magical adventure by a stranger named Henry. On their journey, the boy meets New York Yankee legends, both past and present, who give him lessons about baseball and life." Exhibit "3" attached hereto.

10

"1" attached hereto. In particular, the June 30, 2011 Financial Statement provided, *inter alia*, that:

> Creative was formed under the laws of the State of Delaware in April 2008, and is primarily engaged in providing editing and graphic post-production services for the commercial, corporate, cable and home entertainment markets ("post-production services"). The Company is also presently producing an animated short film but has not yet completed the projects and begun to recognize the revenue.

Exhibit "1."

28. However, the June 30, 2012 Financial Statement indicated that the Debtor did, in fact, have a subsidiary, Henry and Me Productions, LLC ("HMP"), which was formed in November of 2009. See Exhibit "2" attached hereto. In particular, the June 30, 2012 Financial Statement provided, *inter alia*, that:

> The accompanying consolidated financial statements include the accounts of Creative Group Acquisition Co. ("Creative") and its two subsidiaries: Indelible Agency, LLC ("Agency"), which began operations in April 2012 and in which Creative has a 51% controlling interest, and Henry and Me Productions, LLC ("Productions"), which began operations in September 2011 and in which Creative has an 85% controlling interest.

Exhibit "2".

29. Upon information and belief, the Debtor has conveyed its interest in the movie Henry & Me to HMP and unknown others.

30. Furthermore, the Debtor's bank accounts are part of the collateral which it pledged to CNB to secure its debt. In particular, the Agreement provides in pertinent part that CNB is entitled to, among other things, the Debtor's "cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation

SL1 1256327v1 108346.00001 CEV/D910089v1/M059964/C0154260

proceeds and tort claim proceeds". Exhibit "C" to Motion at § I. Also, pursuant to § 6.13 of the Agreement, the Debtor was required to maintain its bank accounts with CNB and not another lending institution. Exhibit "C" to Motion at § 6.13. However, the Debtor has failed to fulfill this obligation. It is clear that the reason that the Debtor maintains an account with TD Bank instead of CNB is to hide its monies from CNB.

31.     Upon information and belief, the Debtor intends to divert the TD Bank Funds to Reveal to frustrate CNB from being able to collect its debt and to frustrate any judgment it may obtain against Defendants.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature]*
CONRAD GUNTHER

SWORN TO AND SUBSCRIBED before
me this 6th day of September, 2013

*[signature]*
Notary Public
My Commission Expires: 5/30/14

BARBARA SPOSITO
Notary Public - State of New York
NO. 01SP6146869
Qualified in Suffolk County
My Commission Expires 5/30/14

SL1 1256327v1 108346.00001 CEV/D910089v1/M059964/C0154260