**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CREATIVE GROUP ACQUISITION CO., *et al.*<br><br>Debtor. | Case No: 13-12258 (KJC)<br>Chapter 11 |

**DECLARATION IN SUPPORT OF THE DEBTORS'**
**PETITIONS AND FIRST DAY MOTIONS**

**RONALD KAPLAN,** pursuant to 28 U.S.C. §1746, declares as follows:

1.      I am an independent member of the board of directors of Creative Group Acquisition, Co., a Delaware corporation with its principal place of business in New York ("Creative") and independent member of the board of directors for its subsidiary, Creative Payment Processing, Inc., a New York corporation ("Processing"; together with Creative, the "Debtors").  I was appointed to Creative's board on September 3, 2013 and to Processing's board on September 5, 2013.  On September 3, 2013, Creative, and on September 6, 2013, Processing, respectively, filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").  The Debtors operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      This Declaration is being submitted in support of the petition and the relief requested in the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my discussions with the members of the Debtors' management, including but not limited to Joseph V. Avallone, the Debtors' president, and information supplied to me by the Debtors' attorneys.  The statements contained herein

are true and correct to the best of my knowledge, information and belief.

3.      I am authorized to submit this Declaration on behalf of the Debtors.   If called upon to testify, I could and would testify competently to the facts set forth herein.

4.      Part I of this Declaration sets forth certain background information regarding the Debtors and the reasons for the chapter 11 filings.

5.      Part II of this Declaration describes the "first day" motions (each such motion, a "First Day Motion" and, collectively, the "First Day Motions")[1] through which the Debtors seeks certain forms of relief necessary for their smooth transition to chapter 11.   I have reviewed the relief sought in each First Day Motion and believe the relief requested in each is necessary to enable the Debtors to continue to operate in chapter 11 and to permit the Debtors to successfully implement their chapter 11 strategy and maintain the value of their business.   Accordingly, I believe the relief sought in the First Day Motions is in the best interests of creditors, the Debtors, and the Debtors' bankruptcy estates.

## PART I:
## NATURE OF THE DEBTORS' BUSINESS AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

**Nature Of The Debtors' Business Operations.**

6.      Creative is a diversified entertainment and media company that produces live action, animation, sound design, sound mixing and recording and broadcast design

---

[1]      Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the relevant First Day Motion.

for the television and film industries.  Creative's services span all media types with operations comprising the entire spectrum of concept development through creative implementation, production, post-production, and distribution.  Creative is well known in its industry for its work on behalf of cable and broadcast networks owned by international media companies such as Viacom (CBS, MTV, VH-1, Nickelodeon, Spike), and NBC/Universal (NBC Sports).  Based upon my discussions with management, I believe that Processing conducts no independent business but was formed in May 2013 solely to centralize payment services for Creative.

7.      Creative was formed on or about June 2008 for the express purpose of acquiring the business assets and continuing the business operations of Creative Group, Inc. and related entertainment industry entities[2] (collectively, "Old Creative").  On March 21, 2008, Old Creative filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York for reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[3]  I served as the independent director of Old Creative during its 2008 bankruptcy proceeding.  I have not held a position with Debtors prior to September 3, 2013.

8.      By Order dated June 30, 2008, pursuant to sections 363 and 365 of the Bankruptcy Code, the Bankruptcy Court for the Southern District of New York approved the sale of substantially all the assets of Old Creative to Creative.

---

[2] Animagic LLC, Fangoria Entertainment, Inc., Nate the Great LLC, Moe Greene Entertainment LLC, Starlog Entertainment, Inc., Starlog Group, Inc., Starlog Licensing of America, Inc., and Tangerine, LLC.

[3] United States Bankruptcy Court, Southern District of New York, Case No. 08-10975 (RDD), lead case, jointly administered.

9.      Based upon my discussions with management, I believe the traditional business of Creative, its bread-and-butter operations, has been in the area of post-production videotape editing and sound-mixing for cable and broadcast customers.  In recent years, Creative has embarked on a program of original content property development as well, which, following industry trends, appears to be the area of most promising growth for Creative and similarly situated companies.  Creative also owns a 51% interest in Mantra Graphics, LLC d/b/a Indelible Agency LLC ("Indelible"). Indelible was a digital advertising agency acquired by Creative in or around March 2012. CNB (defined below) foreclosed on the assets of Indelible in early 2013. Creative also owns an 82.5% interest in Henry & Me Productions, LLC ("H&M"). H&M is a production vehicle that currently has a feature length animated film in production, produced in cooperation with the New York Yankees and Major League Baseball. Several significant events, including substantial unforeseen legal and financial developments, have prevented H&M from completing that movie.

10.     The value of Creative's business lies entirely in the creativity of its almost seventy (70) employees, their interactive synergy, and their relationships with Creative's customers, rather than in an inventory of physical assets.  Accordingly, in order to maximize the value of the Debtors' estates, it is essential that both employees and customers continue their relationships with Creative's business.

**Prepetition Indebtedness And Capital Structure**.

11.     Creative is a private corporation with a significant minority stake (30%) owned by its officers and employees, and a majority stake (70%) owned by Scorpion

Capital Partners, L.P. ("Scorpion"). Processing is a wholly-owned subsidiary of Creative.

12.    The principal debt obligations of Creative (Processing has no creditors) currently outstanding are:

> Loan Obligations with Community National Bank.  As of the Petition Date, Creative were indebted to Community National Bank ("CNB") in the aggregate principal amount of approximately $5,174,041, pursuant to (i) a term note in the original principal amount of $5,000,000 dated as of December 27 2011 ("Term Note"); (ii) a revolving credit note in the original principal amount of $2,400,000 dated as of December 27, 2011 (the "Revolving Note"); (iii) pursuant to a guaranty agreement dated as of May 10, 2012, Creative also guaranteed the indebtedness of Mantra Graphics, LLC, a/k/a Indelible Agency, a related entity, related to a term note in the original principal amount of $500,000 dated as of May 10, 2012 and a revolving credit note in the original principal amount of $500,000 executed by Mantra Graphics, LLC.  Pursuant to a Revolving Credit, Term Loan, and Security Agreement dated as of December 27, 2011 (the "CNB Security Agreement") Creative's obligations to CNB under the Term Note and Revolving Note are secured by a primary lien upon substantially all of its assets.

> Subordinated Note with Signature Bank   Additionally, as of the Petition Date, Creative was indebted to Signature Bank ("Signature") in the aggregate principal amount of approximately   $1,906,750 pursuant to a subordinated secured note dated as of June 30, 2008 as amended pursuant to the Amendment dated as of March 29, 2012 (collectively, the "Subordinated Note"). The Subordinated Note is secured by substantially all of Creative's assets pursuant to the Security Agreement dated as of June 30, 2008, by and between Creative and Signature.  Signature's security interests in and liens upon Creative's assets are subordinated to CNB's liens and security interests pursuant to a Subordination and Intercreditor Agreement dated as of December 27, 2011.

> Tax Debt:

> *Federal tax liens*

> According to IRS notices and demands, Creative owes outstanding taxes to the United States is the approximate amount of $2,998,378.22 as of its Petition Date  Of this total amount, notice was received and penalties assessed in the amount of $710,489.66 by notice from the IRS dated July 1, 2013 (the "IRS Tax Notice"), and Notices of Intent to Levy dated May 13, 2013 (in the

amount of $462,647.04), May 13, 2013 (in the amount of $505,829.92); dated June 3, 2013 (in the amount of $482,021.23) and August 12, 2013 (in the amount of $1,598.19) (collectively, the "IRS Levy Notices"). In addition, by notice dated July 22, 2013, the IRS asserted a tax liability against Creative for taxes due against Mantra in the amount of $486,046.40 and accessed a penalty in the amount of $349,745.99, for a total indebtedness of $835,792.39. .

*New York State tax liens*

According to New York taxing authority demands and notices, Creative owes outstanding taxes to New York State in the approximate amount of $301,837 as of the Petition Date. Of this total amount, notice and demand of payment due was received reflecting total tax liabilities of $230,498.54 by notice from the New York State Department of Taxation and Finance dated July 31, 2013 (the "New York Notice of Demand"). In addition, on or about June 27, 2013, the New York State Department of Labor as judgment debtor served a notice of garnishment to J.P. Morgan Bank in the amount of $71,337.04, and on or about August 5, 2013, served an additional notice of garnishment in the amount of $66,209.91 upon a customer of Creative (the "NYDOL Garnishment Notices"). Finally, notice of a warrant lien, in the amount of $113,433.43 was docketed in New York County by the New York State Department of Taxation and Finance and received by Creative on or about June 18, 2013 (the "Notice of Warranty Lien"). A commissioned lien search performed by CT Corporation also reflects tax liens filed by New York State on April 30, 2013 and August 13, 2013 (together with the Notice of Warranty Lien, the "NY Recorded Liens").

<u>Other Debt.</u>  Creative currently has approximately $2,058,950 million in outstanding unsecured guarantees and obligations to trade vendors and other taxing authorities as of September 1, 2013. A list of Creative's 20 largest unsecured creditors was filed with the Petition.

**Events Leading To Debtor' Chapter 11 Filings.**

13.    Management has informed me that prior to the commencement of the chapter 11 cases, Creative's business suffered from a severe liquidity crisis. The crisis had multiple causes largely related to the national economic downturn and the many changes and contractions in the Debtors' industry. Each of those causes are herein discussed in turn.

**Rapid Changes to the Video Post-Production Industry**:

14.     As discussed, Creative began its life by acquiring the assets of Old Creative, a predecessor business also dedicated to post-production work.  The management and employees of Old Creative largely joined the new business, with the business intention to continue its trade in traditional post-production video editing and sound mixing, while making committed in-roads into original production work.

15.     Unfortunately the 2008-2009 economic downturn affected the cable entertainment industry in ways particularly harmful to video post-production companies. As advertising revenue contracted, cable networks tightened their belts and began utilizing in-house facilities to complete their post-production work.  The emerging popularity of "reality shows" on cable channels accelerated this transition.  The reality shows were much cheaper to produce than scripted television, could be edited on inexpensive toolsets, and could be supported by a freelance editorial labor pool. The demand for external post-production facilities declined, as cable producers hired freelance personnel to work in-house on these shows that seemingly overnight were becoming the primary product on cable channels.

16.     Additionally, to stay competitive, content producers and distributors began producing their content in "high-definition" ("HD") video format much quicker than anyone had foreseen.  Unfortunately for Creative, the bulk of the equipment it had purchased from Old Creative had been "standard definition" ("SD"), which suddenly was becoming no longer the standard.  While the value of this equipment rapidly decreased, the indebtedness Creative incurred primarily in the acquisition of that equipment remained constant.  More importantly, the stream of revenue reasonably projected to be

earned over time from the utilization of that equipment and to service that indebtedness shrank dramatically.

**Creative Adapts to the Altering Industry Conditions**

17.     Creative, which has a significant sports programming client base that requires external production and post-production work, was able to weather the changes in the industry and survive.  However, to hold on to work and accommodate clients who might otherwise seek to develop in-house resources, Creative was forced to cut its margins and was not always successful in retaining or replacing clients who were anxious to trim their costs to survive in a lagging economy.

18.     Realizing that at best it was maintaining itself in an untenable situation, Creative made significant efforts to expand its business into the growing field of web-based advertizing and social media.  Many of these efforts were, and continue to be, successful.  As a result, Creative reasonably foresees being considerably less dependent on traditional post-production in the near future.  However, one effort to grow this promising business, by the acquisition of an existing "new media" operation, proved disastrous.

19.     On or about March 22, 2012, Creative bought a fifty-six percent (51%) interest in Indelible Media Corp. ("Indelible") for $500,000, plus the assumption of certain liabilities.

20.     Unfortunately, Indelible proved to be a bad investment.  Creative soon discovered that revenue that Indelible had booked prior to the acquisition was in fact unearned revenue for which unforeseen costs would have to be expended to earn the

money that, in some cases, had already been spent prior to the acquisition.

21.     Further, it soon became clear that Indelible had vastly overstated its roster of established clients and lacked the expertise to perform the quality of web-based design work Creative required to attract significant clients.  Efforts to turn the company around were unsuccessful.

22.     Finally, in January 2013—after owning the business for less than a year—Indelible was shut down.  Creative was left subsidizing the business in its final months, and was left with the costs of resolving outstanding liabilities for Indelible's office lease and the considerable costs of transferring Indelible's salvable equipment and some of its personnel to the Debtors' principal facilities at 1601 Broadway, New York, New York.  In addition, Creative as guarantor of Indelible's debt obligations to CNB became liable on Indelible's loan indebtedness of more than $1 million, and was also obligated to pay off other Indelible debts.

23.     The Indelible misadventure resulted in two lawsuits directed at Creative, and the Debtors are likely to pursue their own litigation relating to the acquisition in the near future.

**Liquidity Crisis**

24.     As a result of the above-mentioned set-backs, as of the end of 2012, Creative began to lack the necessary liquidity to service its bank indebtedness.

25.     Creative ceased to make the monthly payment due CNB on May 15, 2013 on the Term Note and under a forbearance agreement made interest only payments from May 15, 2013 through July 31, 2013.  Creative also failed to pay the outstanding balance

on the Revolving Note on its maturity date of May 31, 2013.  On or about June 10, 2013, CNB served a complaint for an action relating to Creative's  loan defaults in New York State Supreme Court, Nassau County, styled, Community National Bank v. Creative Group Acquisition Co., Mantra Graphics LLC N/K/A Indelible Agency LLC, Index No. 7296/13 (the "CNB Action").

26.     Prosecution of the CNB Action was held in abeyance while Creative and CNB held discussions and sought to resolve the financing issues with CNB.  Creative was under the impression that these discussions were productive and that the parties were close to a resolution.  However, on September 3, 2013, Creative was served with an Order to Show Cause for a Temporary Restraining Order in the CNB Action that was returnable on September 4, 2013.  If granted, the temporary restraining order would have resulted in the immediate termination of Creative's business operations.  Accordingly, on September 3, 2013, Creative filed a "bare-bones" petition in this Court, seeking a safe harbor from CNB, in order to preserve its value as a going-concern.  Discussions with CNB have continued post-petition, and the Debtors remain hopeful of a consensual resolution.

27.     Creative ceased to make interest payments to Signature Bank in December 2012 and made no payments to Signature bank after January 2013.  Creative has not received any notices of default from Signature Bank.

28.     Through 2012 and 2013, Creative missed its payments of various taxes, including payroll taxes, owed to the federal government, the States of New York and Connecticut, as well as to local taxing authorities.  As its cashflow improved, Creative was able progressively to meet some of its tax obligations going forward, but has been

unable to pay the tax arrearages, which continue to accrue significant interest and penalties.

29.     As a result of its indebtedness outlined above, the Debtors took the unavoidable and necessary step of filing the chapter 11 petitions to stabilize their day-to-day operations, and protect and preserve the value of their assets for the benefit of their creditors.  The Debtors believe that, under the protection of the Bankruptcy Code, they will be able to maximize their value as a going-concern business and attract a potential purchaser.

30.     Accordingly, I believe that commencement of these chapter 11 cases was necessary and in the best interests of creditors.

**Other Information Required Pursuant To Bankruptcy Rule 1007**

31.     Pursuant to Bankruptcy Rule 1007 (a)(1), attached as <u>Exhibit A</u> hereto is a list of the names and addresses of each person or entity that is included on their Schedules D, E, F, G, and H, as well as a statement of corporate ownership containing the information required under Bankruptcy Rule 7007.1.

32.      Pursuant to Bankruptcy Rule 1007(a)(3) the Debtors have filed a list of its equity security holders, disclosure of their holdings, and their last known name and address or place of business.

33.     Pursuant Bankruptcy Rule 1007(d) the Debtors have filed a list of the names, addresses and, where available, telephone numbers, of the creditors of Creative holding the twenty largest unsecured claims, excluding insiders. Such list includes the amount of the claim, the nature of the claim (i.e., trade debt, real property leases, etc.)

and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.

## PART II
## FACTS IN SUPPORT OF FIRST DAY MOTIONS

34.    The Debtors are in the process of filing their First Day Motions.   The Debtors request that each of the First Day Motions described below be granted, as each constitutes a critical element in achieving a successful transition to chapter 11.

35.    For a more detailed description of these motions, the Debtors respectfully refer the Court to the respective First Day Motions.   To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

**A. Motion For An Order (A) Authorizing Use Of Cash Collateral Pursuant To 11 U.S.C. § 363(c)(2)(b) and (B) Granting Adequate Protection (the "Cash Collateral" Motion).**

36.    The total indebtedness for the IRS liens, with additional interest and penalties through the Petition Date, is approximately $3 million.  By law, the IRS tax liens arose automatically "after demand" pursuant to 26 U.S.C. §6321.  While IRS liens do not enjoy absolute priority over earlier perfected liens in all cases, I understand such liens enjoy primacy as to after-acquired property—including accounts receivable—acquired after the lien commences.

37.    The priority among the Junior Lien Holders is easily determined.  CNB's lien upon essentially all Creative's assets sits behind the IRS lien, pursuant to the above-cited federal law.  The lien of Signature Bank is also secured by substantially all of

Creative's assets pursuant to the Security Agreement dated as of June 30, 2008, however, by its terms, the Signature Bank lien is expressly subordinate to CNB's liens and security interests pursuant to a Subordination and Intercreditor Agreement dated as of December 27, 2011.  Finally, the NY Recorded Liens, which arose last in time in 2013, sit most junior in priority, since, I understand that pursuant to New York law, such tax liens are accorded a priority equivalent to UCC liens and assert no power to "jump the line" to take priority interests in after-acquired property.

38.    While the Junior Lienholders may each assert their own secured interests in the cash on hand and in Creative's accounts and after-acquired cash flow, only the IRS is "in the money".  The consequence of that fact is that none of the Junior Lienholders is entitled to actual cash payments, nor replacement liens, nor any tangible adequate protection relief pursuant to Section 361.

39.    As to the IRS, the Debtors propose to provide the IRS with adequate protection in the form of continuing and replacement liens in accounts as they are created and in the consequent cash flow, as well as providing the IRS with superpriority administrative claims.  Through the use of the IRS' cash collateral, the IRS will also be adequately protected in that the cash collateral will be used entirely for the maintenance of the Debtors' business and the preservation of Creative's greater collateral value as a going-concern.

40.    Absent the relief, much of the cash collateral subject to this motion would not even come into existence, since Creative's business is operated largely on a per-project basis and cessation of the business will not only cause an end to income

generation, but also potentially create liability for the return of progress payments. Consequently, and somewhat ironically, absent granting the Debtors use of cash collateral, the IRS' cash collateral may be unjustifiably jeopardized. The Debtors respectfully submit that the protections proposed in the Cash Collateral Motion are appropriate to adequately protect the IRS's security interests.

**B. Debtors' Motion For An Order Pursuant To 11 U.S.C. §§ 105 (A) And 507(A)(4) And (5) (I) Authorizing The Debtor To Pay Prepetition Wages And Salaries And Related Taxes And (II) Directing All Banks To Honor Checks For Payment Of Prepetition Employee Obligations ("Wage Motion").**

41. Creative employs approximately 70 salaried employees (the "Salaried Employees"). Creative also relies on certain creative employees to produce media and entertainment properties intermittently throughout the year. The creative employees' work is sporadic; thus, to reduce the overhead associated with such employees, Creative employs and pays them on an as-needed basis (the "Non-salaried Employees"). The number of Non-Salaried Employees working for Creative in a particular month varies greatly depending on the projects that are in production. As of the Petition Date, Creative obtains services from approximately twenty (20) Non-Salaried Employees.

42. It is crucial that the Non-Salaried Employees be paid for work completed prior to the Petition Date to ensure that they continue to be available to the Debtors for on-going and future creative production projects. The Debtors are concerned that if they are not authorized to pay the Non-Salaried Employees for prepetition wages and on an as-needed basis going forward, they will refuse to render future services to Creative, which would have a devastating impact on the Debtors' business.

14

43.     The continued and uninterrupted service of the Salaried Employees and Non-Salaried Employees is essential to the Debtors' reorganization.  To minimize the personal hardship the Salaried Employees and Non-Salaried Employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the Salaried Employees' and Non-Salaried Employees' morale during this critical time, the Debtors, by this Motion, seeks authority to (i) pay all prepetition Salaried Employees and Non-Salaried Employees claims for wages, salaries and other accrued compensation and related taxes up to the statutory cap of $11,725 per employee,[4] (ii) make all payments for which Salaried Employees' payroll deductions were made, (iii) reimburse all prepetition Salaried Employees and Non-Salaried Employees business expenses, (iv) make prepetition contributions and pay benefits under certain employee benefit plans, (v) honor workers' compensation obligations, (vi) pay other miscellaneous, employee-related costs, (vii) continue prepetition programs with respect to vacation, sick, personal and holiday leave and continue certain health, welfare, savings and other benefit programs as described more fully below (collectively, the "Employee Obligations").

44.     The Debtors also (i) request that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all prepetition checks and transfers drawn on Processing's accounts related to the Employee Obligations

_____

[4] The Debtors do not anticipate that the payment made to any Salaried Employee or Non-Salaried Employees in connection with prepetition wages, salary, and other compensation will exceed the sum of $11,725  allowable as a priority claim under section 507(a)(4) and (5) of the Bankruptcy Code.  To the extent any such claim exceeds the statutory cap, the compensation paid to any Salaried Employee or Non-Salaried Employee will be limited to the $11,725  authorized by the Bankruptcy Code.

and (ii) seek authority to pay all processing costs and administrative expenses related to the foregoing payments.

**Summary of Prepetition Employee Obligations.**

**(a)      Wages, Salaries and Other Compensation.**

45.      The Debtors pay Salaried Employees on a weekly basis. The Debtors' average weekly payroll is approximately $90,000.[5] The Debtor employs the services of Paychex to calculate and issue the Salaried Employees' paychecks and direct deposits. Paychecks are drawn on  Processing's payroll account.  As of Processing's Petition Date, all outstanding payroll through September 13, 2013 was fully paid.

46.      The Debtors pay Non-Salaried Employees as they receive invoices from each Non-Salaried Employees.  While the Debtors believe there are no arrears on the invoices already submitted to them, they anticipate receiving invoices for prepetition services from certain Non-Salaried Employees subsequent to the Petition Date (the "Prepetition Invoices").  The Debtors estimate that the Prepetition Invoices will not exceed $50,000 and seek authority to continue to pay the Prepetition Invoices as they are submitted.

47.      The Debtors also make vehicle lease payments on behalf of approximately seven employees (the "Car Lease Payments").  The Car Lease Payments are a component of the eligible employees' total compensation.  The cost of the Car Lease Payments is approximately $4,200 per month. It is important to note that the vehicles are leased by the

---

[5] Net of all deductions required for taxes, benefits and other employee programs.

individual employees rather than the Debtors.

**(b)**     **Vacation, Sick, Personal and Holiday Leave.**

48.     In the ordinary course of business and as is customary with most companies, Creative established various employee benefit plans and policies for the benefit of its Salaried Employees that provide such persons with vacation, holidays, sick time, and similar benefits for current employees (collectively, the "Employee Benefits").  Salaried Employees are generally not entitled to a cash payout for Employee Benefits.  Creative anticipates that its Salaried Employees will utilize any accrued Employee Benefits without resulting in any material cash flow requirements beyond Creative's normal payroll obligations.

**(c)**     **Insurance Benefits.**

49.     In the ordinary course of its business, Creative provides its full-time Salaried Employees with certain health insurance programs.  Specifically, full-time Salaried Employees, who have served 30 full calendar days, are offered medical, prescription drug and dental insurance benefits (the "Health Benefits").  The Debtors' average monthly cost for the Health Benefits is approximately $48,000.  As of September 3, 2013, Creative owes CIGNA approximately $48,000 on account of Health Benefits due and owing for September 2013.

50.     In the ordinary course of its business, Creative also pays life insurance premiums on policies owned by two employees (the "Life Insurance Benefits").  The average monthly cost for Life Insurance Benefits is $4,000.  As September 3, 2013, Creative owes $4,000 in the ordinary course on account of Life Insurance Benefits

currently due and owing.

### (d)    Reimbursable Business Expenses.

51.    In the ordinary course of business, Salaried Employees may incur a variety of business expenses that are typically reimbursed by the Debtors pursuant to their normal business practices.  The reimbursable business expenses incurred by Salaried Employees include business travel, business meals, car rentals, delivery expenses and related expenses (collectively, the "Reimbursable Business Expenses").    All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtors.  As September 3, 2013, the Debtors estimate that the Salaried Employees collectively incurred unreimbursed expenses aggregating approximately $8,000.

### (e)    Workers' Compensation Obligations.

52.    Under the laws of the various jurisdictions in which they operate, Creative is required to maintain workers' compensation policies and programs to provide Employees with workers' compensation coverage for claims arising from or related to their employment.  Accordingly, Creative maintains workers' compensation programs in all states in which it operates, pursuant to the applicable requirements of local law.

53.    As of its Petition Date, Creative was owed approximately $41,000 for premium on account of the workers' compensation policies.

### (f)    Savings Plans.

54.    Creative maintains a savings plan for the Employees, which is qualified under section 401(k) of the Internal Revenue Code (the "Savings Plan").  Pursuant to the Savings Plan, Processing deducts the appropriate amounts from each participating

Employee's payroll check on a weekly basis and transfers the withheld funds to the plan trustee at the end of each week.  As of the Petition Date, the Debtors hold approximately $8,000 in Savings Plan funds from employees that must be transferred.

### (g)    Prepetition Processing Costs.

55.    The Debtors also request authorization to pay the various costs incident to maintaining, or paying third parties to maintain and provide record keeping and other administrative services relating to the various Employee Benefits programs identified in this Motion that may be outstanding as of the Petition Date (the "Prepetition Processing Costs").  The Debtors believe that as of the Petition Date approximately $1,000 is owed with respect to Prepetition Processing Costs.

### (h)    Payroll Taxes and Deductions.

56.    The Debtors make weekly payments to cover outstanding tax obligations related to employee and employer payroll taxes. As discussed, Creative owes interest and penalties incurred for the late payment of payroll taxes.  The amount of interest and penalties is to be determined by the Internal Revenue Service.  The Debtors seeks authority to pay payroll taxes associated with the Employee Obligations covered by this Motion.

**Authority for Banks to Honor and/or Reissue Checks.**

57.    The Debtors further request that the applicable banks be authorized to receive, process, honor and pay any and all check and transfers drawn on the Processing's accounts relating to the Employee Obligations, whether such checks were presented before, or are presented after, September 3, 2013.

19

58.    Accordingly, by the Wage Motion, the Debtor seeks (i) authorization for, and/or ratification of, their bank's honoring of prepetition payroll checks and transfers on or after the Petition Date, (ii) authorization for the bank to process and honor all other checks issued for payments approved by the Wage Motion, and (iii) authorization to reissue checks for payments approved by the Wage Motion where the check therefore is dishonored postpetition.

C.    **Motion For An Order (1) Authorizing The Debtor To (A) Continue and Maintain Their Consolidated Cash Management System, (B) Continue And Maintain Their Existing Bank Accounts And (C) Use Existing Business Forms; And (2) Granting Related Relief ("Cash Management Motion").**

59.    As more fully set forth in the Cash Management Motion, to avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtors, and to ensure an orderly transition into chapter 11, the Debtors respectfully requests an order authorizing the Debtors to continue to use their existing bank accounts, cash management system, checks, and business forms.

60.    The Debtors pay payroll, vendors and other obligations through a certain deposit, payroll, and disbursement account (collectively, the "TD Bank Account") with TD Bank N.A. ("TD Bank").  The Debtors submit that TD Bank is a financially stable institution.

61.    The Debtors use the TD Bank Account to perpetuate their businesses.  From this account, the Debtors pay expenses related to pay payroll, vendors and other obligations of the Debtors.  More importantly, all of the Debtors' clients previously arranged to automatically wire payment for the Debtors' accounts receivables to the TD Bank Account (the "Cash Management System").

20

62.     The Cash Management System includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors maintain and will continue to maintain detailed and accurate accounting records reflecting all transfers of funds.  The Debtors' Cash Management System is similar to those used by other corporate enterprises and provides significant benefits to the Debtors, including the ability to (a) accurately and immediately report receipts and expenditures, (b) control corporate funds centrally, (c) ensure the availability of funds when necessary, and (d) reduce administrative expenses by centralizing the movement of funds.

63.     Accordingly, by the Cash Management Application, the Debtor seeks entry of an Order, substantially in the form submitted with the Cash Management Application, pursuant to sections 105, 362(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code:

1.      authorizing the Debtors, on the terms set forth below and solely to the extent permitted under the terms of the Debtors' proposed debtor in possession financing, to continue to use their existing cash management system (the "**Cash Management System**") without interruption in the ordinary course of business;

2.      directing that the Cash Management Banks (defined below) at which the Debtors maintain the Bank Accounts (defined below) are stayed from offsetting, affecting or otherwise impeding the use or transfer of or access to any funds, contained or deposited in the Bank Accounts which are utilized in the Debtors' day-to-day operations on or subsequent to the commencement of the Chapter 11 Cases for any reason or on account of any claim (as defined in section 101(5) of the Bankruptcy Code) of the Cash Management Banks;

3.      directing the Cash Management Banks to transfer, in accordance with prepetition practices, or at the request and direction of the Debtors, any funds in the Bank Accounts to the extent set forth herein;

21

4.    authorizing the Debtors to maintain and continue to use, with the same account numbers, the Bank Accounts maintained with the Cash Management Banks, and directing that all such Bank Accounts be treated for all purposes as debtor in possession accounts;

5.    authorizing and directing the Cash Management Banks to service and administer the Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Accounts, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of the Debtors for which payment is authorized by court order, provided that sufficient funds exist, whether deposited prior or subsequent to the commencement of the Chapter 11 Cases, to cover such checks upon presentment;

6.    authorizing the Debtors to use, in their present form, existing checks and other documents, including their existing business forms, relating to the Bank Accounts, provided, however, that the Debtors shall make reasonable best efforts to add a "DIP" designation to their existing checks and other business forms; and

7.    granting a waiver of the investment guidelines of section 345 of the Bankruptcy Code, subject to a 60-day objection period for the United States Trustee (the "**U.S. Trustee**").

D.    **Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Alerting, or Refusing Service, (II) Deeming Utility Companies To Have Adequate Assurance of Payment, and (III) Establishing Procedures For Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105 and 366 ("Utility Motion").**

64.    Through the Utility Motion, the Debtors seeks entry of interim and final orders pursuant to 11 U.S.C. §§ 105(a) and 366: (a) prohibiting its utility companies (the "Utility Companies") from discontinuing, altering or refusing service to the Debtors except as set forth herein, (b) deeming the Utility Companies adequately assured of future performance of payment , and (c) establishing procedures for resolving requests for additional assurance of payment.

65.    In the operation of its facilities, the Debtors incur utility expenses in the

ordinary course of business for, among other things, electricity, telephone service, internet service and waste disposal.  Prior to September 3, 2013, on a monthly basis, the Debtors spent approximately $35,000 for various utility services.  A list of the Utility Companies is attached to the Utility Motion as Exhibit C.

66.    Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' chapter 11 efforts.  Indeed, any disruption to the Debtors' operations by virtue of the cessation of utility services by the Utility Companies could bring the Debtors' operations to a grinding halt. Should one or more of the Utility Companies would be severely disrupted.  Such an interruption would damage customer relationships, revenues, and profits and would ultimately adversely affect the Debtors' chapter 11 efforts, to the detriment of its estate, creditors, and employees. It is therefore critical that utility services provided to the Debtor continue uninterrupted.

67.    The Debtors submits that their proposals to deposit an amount equal to 50% of the Debtors' estimated monthly cost of utility services into a segregated account maintained by the Debtors  and the Debtors' current financial condition adequately assure payment to the Utility Companies without the need for deposits or other security.  The Debtors have, and will continue to have, sufficient funds from on-going operations to make timely payments to all Utility Companies on account of postpetition services provided.

68.    Additionally, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the

event that a Utility Company believes that additional adequate assurance is necessary.

The Debtors submit that reasonable procedures would provide that:

(i) Absent any further order of this Court and except as otherwise provided herein, the Utility Companies may not alter, refuse or discontinue service to, or discriminate against, the Debtors on account of the commencement of these chapter 11 cases or any unpaid prepetition charges, or request payment of a deposit or receipt of other security in connection with any unpaid prepetition charges.

(ii) The Debtors will serve the Motion and the interim order, if granted by the Court, via first-class mail, within five (5) business days after the date that the interim order is entered by the Court, on each of the Utility Companies identified on Exhibit C attached to the Utility Motion. In the event that any Utility Company was omitted from Exhibit C, the Debtors shall have the right to supplement Exhibit C and shall promptly provide notice of the Order upon learning of such Utility Company;

(iii) Any Utility Company may request additional assurance of payment (an "Additional Payment Request") within thirty (30) days after the Petition Date (the "Additional Payment Request Deadline") by submitting the request to Debtors' counsel, DuffyAmedeo LLP, 275 Seventh Avenue, 7th Fl, New York, New York 10010, attention: Todd S. Duffy, Esq.

(iv) Any Additional Payment Request must (i) be in writing, (ii) set forth the location for which utility services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits or other prepayments or assurances previously provided by the Debtors, (iv) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not constitute satisfactory adequate assurance of payment, (v) include a proposal for what would constitute adequate assurance from the Debtors, along with an explanation of why such proposal is reasonable.

(v) If a Utility Company makes a timely Additional Payment Request that the Debtors believe is reasonable, the Debtors shall be authorized in their sole discretion to comply

with such request without further order of the Court.

(vi) If the Debtors believe that a Utility Company's Additional Payment Request is unreasonable, the Debtors will schedule a hearing at the next omnibus hearing date scheduled in these cases (a "Determination Hearing") to determine adequate assurance to such Utility Company as necessary, or if additional assurance as to payment to such Utility Company is necessary.

(vii) Pending resolution of a Utility Company's Additional Payment Request at a Determination Hearing, such party shall be prohibited from altering, refusing or discontinuing service to the Debtors.

(viii) If a Utility Company fails to send an Additional Payment Request by the Additional Payment Request Deadline, such Utility Company shall have waived its right to make an Additional Payment Request and shall be deemed to have received adequate assurance of payment in accordance with section 366(c)(1)(A)(vi) (Utility Companies that do not send Additional Payment Requests to the parties set forth above by the Additional Payment Request Deadline shall be collectively referred to herein as the "Consenting Utility Companies").

(ix) A Utility Company shall be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further adequate assurance of payment.

**D. Debtors' Applications for Order Pursuant to Sections 327, 328 and 1107 of the Bankruptcy Code and Fed. R. Bankr.P. 2014 Authorizing the Employment and Retention of DuffyAmedeo LLP As Counsel to the Debtor ("DuffyAmedeo Application") and the Employment and Retention of Gellert Scali Busenkell & Brown (the "GSB&B Application").**

69. By the DuffyAmedeo and GSB&B Applications, the Debtors seeks authorization to retain and employ DuffyAmedeo LLP ("DuffyAmedeo") and Gellert Scali Busenkell & Brown ("GSB&B") as counsel in connection with the filing and prosecution of the chapter 11 case on behalf of the Debtor, effective as of the Petition Date. The Debtor selected DuffyAmedeo and GSB&B to serve as bankruptcy counsel

because of their attorneys' experience in the fields of debtor and creditors' rights, insolvency, debt restructuring and corporate reorganization and commercial law. Accordingly, the Debtor believe that DuffyAmedeo and GSB&B are both well qualified and able to represent the Debtors in these chapter 11 cases.

70.     The professional services the Debtor anticipates DuffyAmedeo will render include, but are not limited to:

- providing the Debtors with advice and preparing all necessary documents regarding debt restructuring, bankruptcy and asset dispositions;

- taking all necessary actions to protect and preserve the Debtors' estate during the pendency of the chapter 11 case, including the prosecution of actions by the Debtor, the defense of actions commenced against the Debtor, negotiations concerning litigation in which the Debtor is involved and objecting to claims filed against the estate;

- preparing on behalf of the Debtors, as Debtors in possession, all necessary motions, applications, answers, orders, reports and papers in connection with the administration of these chapter 11 cases;

- counseling the Debtors with regard to its rights and obligations as Debtors in possession;

- appearing in Court and to protect the interests of the Debtors before the Court; and

- performing all other legal services for the Debtors which may be necessary and proper in this proceeding.

71.     It is necessary for the Debtors to employ experienced counsel to provide the foregoing legal services.

72.     It is contemplated that DuffyAmedeo will be compensated pursuant to the terms of the retainer agreement dated July 22, 2013.  The terms of that arrangement are set forth in detail in the DuffyAmedeo Application, and are consistent with the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, corresponding Local Rules, orders of this Court, and guidelines established by the United State Trustee.

73.     It is contemplated that GSB&B will be compensated pursuant to the terms of the retainer agreement dated August 21, 2013.  The terms of that arrangement are set forth in detail in the GSB&B Application and are consistent with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, corresponding Local Rules, orders of this Court, and guidelines established by the United State Trustee.

74.     DuffyAmedeo and GSB&B understand that any compensation and expenses paid to them must be approved by this Court upon application consistent with the Bankruptcy Code and all applicable Bankruptcy Rules and any order entered by the Court.

75.     The Debtors submit that DuffyAmedeo and GSB&B have no interests adverse to the Debtors' estates and each is a disinterested person as defined under section 101(14) of the Bankruptcy Code, and therefore the retention of DuffyAmedeo and GSB&B under the terms described in their respective retention motions is appropriate under sections 327, 328 and 1107 of the Bankruptcy Code.

## CONCLUSION

76.     The Debtors respectfully requests that all of the First Day Motions be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: September 6, 2013

By: Ronald Kaplan
Title: Independent Board Member of Creative Group Acquisition Co. and Creative Payment Processing, Inc.

28